**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AYDM ASSOCIATES, LLC,**

                                        **Plaintiff,**

             **vs.**                                         **7:13-cv-01283**
                                                             **(MAD/TWD)**

**TOWN OF PAMELIA and**
**LAWRENCE C. LONGWAY,**

                                        **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FEENEY, CENTI & MACKEY**              **L. MICHAEL MACKEY, ESQ.**
100 Great Oaks Boulevard
Albany, New York 12203
Attorneys for Plaintiff

**MURPHY, BURNS, BARBER &**             **PETER G. BARBER, ESQ.**
**MURPHY, LLP**
226 Great Oaks Boulevard
Albany, New York 12203
Attorneys for Plaintiff

**BARTH SULLIVAN BEHR**                 **DAVID H. WALSH, IV, ESQ.**
224 Harrison Street
Suite 206
Syracuse, New York 13202
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

     On October 16, 2013, Plaintiff AYDM Associates, LLC, ("Plaintiff") commenced this

action pursuant to 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1985 ("Section 1985")

against Defendant Town of Pamelia (the "Town") and Defendant Lawrence C. Longway

(collectively "Defendants"). *See* Dkt. No. 1. Plaintiff asserts claims for procedural and substantive violations of the Due Process Clause of the Fourteenth Amendment and violations of the Equal Protection Clause of the Fourteenth Amendment as well as claims of conspiracy to deprive him of these constitutional protections. *See* Dkt. No. 1. Additionally, Plaintiff asserts a state claim for tortious interference with a contract. *See id.* Presently before the Court is Defendants' summary judgment motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of this action against them. *See* Dkt. No. 41.

## II. BACKGROUND

Defendant Longway was first elected the Town of Pamelia Supervisor in 1992 and continues to serve in that capacity. *See* Dkt. No. 41-26 at 12-13. In 1991, Defendant Longway purchased eighty acres of property in the Town of Pamelia. *See id.* at 15. As the property owner, he entered into an agreement with a land developer, Colton Corporation, to build forty-six, single-family homes. *See* Dkt. No. 41-11 at 33-34; Dkt. No. 41-26 at 17-19. Ten homes were initially built by Colton Corporation, and a subsequent developer built an additional twenty-five single-family residences. *See* Dkt. No. 41-26 at 22-23. The remaining eleven lots were not developed. *See id.* This development was named Liberty. A part of this property was also approved for development of townhouse/apartment complexes. *See* Dkt. No. 41-11 at 33; Dkt. No. 41-26 at 28. This second tract of land on the property was approved by the Town of Pamelia Planning Board (the "Planning Board") for the development of multi-dwelling residences, but no action beyond the Planning Board's conditional approval was ever taken. *See* Dkt. No. 41-26 at 28.

Guy Javarone is a "member" of Plaintiff AYDM Associates. *See* Dkt. No. 41-30 at 13. Plaintiff is a corporation that owns two properties located within the Defendant Town of Pamelia. *See id.* at 14. The Emerald Acres subdivision is one of these properties. *See id.* at 16. On July

2

12, 2010, Mr. Javarone notified Defendant Longway that Plaintiff was considering the development of a subdivision in the Town of Pamelia, and Plaintiff claims that Defendant Longway offered to sell him his track of land, which had already been approved for development, for $610,000, but Defendant Longway disputes that he made this offer.[1]  *See* Dkt. No. 41-30 at 41-42, 46; Dkt. No. 41-26 at 72-73.  In either event, Defendant Longway did not express disapproval of Plaintiff's proposed subdivision during their conversation.  *See* Dkt. No. 41-30 at 48.

In August 2010, Plaintiff submitted an application for a subdivision to the Planning Board.  *See* Dkt. No. 46-47 at ¶ 16.  Shortly thereafter, Plaintiff submitted a revised application for a "cluster" subdivision of fifty townhouse units on 5.471 acres of land located at State Route 37 and Graham Road in the Town of Pamelia ("Emerald Acres" or the "subdivison").  *See* Dkt. No. 46-6; Dkt. No. 46-47 at ¶ 16.  The Planning Board held the first public hearing on this project on September 1, 2010.  *See* Dkt. No. 41-30 at 69; Dkt. No. 46-9.  Harry Potter, the Chairperson of the Planning Board, had concerns about whether the proposed subdivision was an approved use of the commercially zone property because multi-dwelling homes were not a permitted use.  *See* Dkt. No. 41-30 at 66-68; Dkt. No. 46-9.  Mr. Javarone thinks that Mr. Potter was negatively influenced by Defendant Longway prior to the public hearing, but he does not have any basis for that conclusion.  *See* Dkt. No. 41-30 at 69.

On October 6, 2010, a public hearing was held by the Planning Board and the subdivision was presented by Plaintiff.  *See* Dkt. No. 41-7.  A prior board member, who assisted in drafting the Town's ordinances, expressed opposition to the subdivision, and the Planning Board also presented a letter from the Jefferson County Planning Department, which expressed that the use

---

[1] For purposes of this motion, the Court accepts the facts as alleged by Plaintiff.

of the commercial property for multi-dwelling residences was not permitted.  *See id.*; Dkt. No. 41-12 at 60; Dkt. No. 46-17 at 2.  Final approval was initially denied, but the denial was rescinded to allow for further clarification on the zoning restrictions.  *See* Dkt. No. 41-7.  Mr. Javarone also thinks that "there is some information that was out there that [Defendant Longway] had some conversations with the County," but he acknowledges that he does not know.  *See* Dkt. No. 41-30 at 74.  Mr. Javarone does not think that Defendant Longway influenced Planning Board member Eileen Fanning to vote against Plaintiff's project at this public hearing.  *See* Dkt. No. 41-30 at 82.  However, he thinks that Planning Board members Mr. Potter and Robert Dorr were influenced by Defendant Longway, but, again, he is unable to articulate a reason for that belief.  *See* Dkt. No. 41-30 at 83-84.

On October 20, 2010, the Planning Board held a special meeting for the purpose of reviewing Plaintiff's application.  *See* Dkt. No. 41-8.  The legal parameters of the zoning district and the land set aside requirements for green space were clarified in Plaintiff's favor at this meeting.  *See id.*  Single-family dwellings were a permitted use on the property at issue, meaning that no zoning permit or variance would be required.  *See* Dkt. No. 46-17 at 2.  However, Plaintiff's property was too restrictive to build "conventional single-family" dwellings that would be financially viable.  *See id.*  Under these restrictions, Plaintiff devised a plan to build townhouses under the cluster development clause of Town of Pamelia Zoning Law.  *See id.*; *see* Dkt. No. 48-18 at 23-26.  Plaintiff represented to the Planning Board that the proposed townhouses could be considered single-family dwellings,[2] and the Planning Board agreed with Plaintiff.  *See id.*; Dkt. No. 46-17 at  6-7.

---

[2] According to Plaintiff's Engineers, the Town Zoning Law defines a "Single-Family Dwelling" as a "[d]etached building designed for or occupied exclusively by one (1) family." Dkt. No. 46-17.

The Planning Board accepted the State Environmental Quality Review Act ("SEQR") form as presented by Plaintiff, *see* Dkt. No. 41-8, which designated the subdivision as an unlisted action, also referred to as Type-II action, under the Act. *See* Dkt. No. 46-47 at ¶ 18. On October 20, 2010, the Planning Board issued a negative declaration under SEQR, meaning that the subdivision would not cause significant impact upon the environment. *See* Dkt. No. 41-8 at 3; Dkt. No. 46-47 at ¶ 18. On the same day, the Planning Board granted final approval for Plaintiff's subdivision subject to seven conditions. *See id.* at ¶ 19. Among those conditions, final approval required Plaintiff to submit engineering drawings of water distribution plans to the New York Department of Health ("DOH") and to provide a copy of the DOH approval to the Planning Board. *See id.* at ¶ 20. The property at issue was not purchased by Plaintiff until after this final conditional approval was made.[3] *See* Dkt. No. 41-30 at 71. Planning Board members Ms. Fanning and Mr. Potter voted against approving the subdivision. *See id.* at 88. Although he does not believe that Ms. Fanning was influenced by Defendant Longway, he believes that Mr. Potter was influenced based on his belief that Defendant Longway "[m]ay have talked to him," but he does not know for sure. *See id.* at 88.

Mr. Javarone thinks that Defendant Longway "is portrayed in the Town of Pamelia as a very powerful man and if he wants to influence something, he's going to, and [Mr. Javarone] think[s] [Defendant Longway] might have had some conversations with Mr. Potter." *See id.* at 88. Based upon Defendant Longway's offer to sell his property, Mr. Javarone was concerned that Defendant Longway would not fully support Emerald Acres. *See id.* at 56. Mr. Javarone characterized this offer as a "shake-down" even though the offer was only mentioned one time.

_____

[3] There is no evidence of the date the property was transferred into Plaintiff's ownership, but Mr. Javarone submitted an affidavit stating that the property was purchased in January 2011. *See* Dkt. No. 46-46 at ¶ 10.

*See id.* at 163. Defendant Longway did not ever threaten Mr. Javarone that he would impede

Plaintiff's project if his property was not purchased. *See id.* at 163. Mr. Javarone believed that

Defendant Longway was a "bully, and if he didn't like something, he wasn't going to let it

happen." *See id.* at 56. Mr. Jaravone acknowledges that he did not have any personal experiences

with Defendant Longway prior to Emerald Acres that formed this impression. *See id.* at 56-57.

Mr. Javarone thinks that perhaps someone told him or he read in a newspaper that Mr. Longway

was a bully, but he does not recall. *See id.* at 57.

Separate from his interactions with the Town, Guy Javarone went to the DOH and had an

unscheduled meeting with Claude Curley, a public health engineer with the DOH, on or about

September 2, 2010. *See* Dkt. No. 41-14 at 8-9. Mr. Javarone made an audio recording of this

meeting unbeknownst to Mr. Curley. *See id.* at 11. Mr. Curley advised that the plan to build fifty

townhouses on approximately five acres of land was a realty subdivision under the definition of

New York Public Health Law and Sanitary Code, and he provided Mr. Javarone with a standard

packet of policy and guidance developed by the DOH for approval, which included a realty

subdivision checklist. *See id.* at 14. At that meeting, Mr. Javarone learned that the Planning

Board may have provided incorrect information about the water meter requirements for individual

townhouses and that a town engineer may also advise him differently from the Planning Board

once he or she reviewed the plan. *See id.* at 14-15.

Prior to December 9, 2010, Mr. Curley also had an impromptu meeting with Harry Potter,

a member of the Planning Board, who went to see Mr. Curley requesting his assistance and advice

regarding the development of Emerald Acres. *See id.* at 19. On December 9, 2010, Mr. Curley

sent a letter to Defendant Longway outlining realty subdivision approval under New York Public

Health Law and specifically noted that a Type-I SEQR review and determination was required,

among other requirements. *See* Dkt. No. 41-15. Mr. Curley stated that "[in] this particular instance, the planning board may have acted prematurely, and should have issued a 'preliminary' or 'conceptual' endorsement to the developer, subject to completion of the above." *Id.* In closing, the DOH further advised that "[t]he final approval by the planning board for a NYS Realty Subdivision should not occur until the final plan has been reviewed by [DOH] for consistency with DOH regulations, or contact has been made by your planning board chair to coordinate our approval process." *Id.* At the time of the letter, Mr. Curley knew that the Planning Board had granted final approval to Plaintiff. *See* Dkt. No. 41-14 at 22. The DOH also advised in this letter that the town should retain its own engineering firm to review the plans and specification for public water main distribution extension prior to seeking DOH approval. *See* Dkt. No. 41-15.

Mr. Curley wrote this letter to Defendant Longway of his own volition because he thought that Mr. Potter expressed some confusion about the handling of a realty subdivision. *See id.* at 24. Mr. Javarone believes that Defendant Longway was involved in the drafting of this letter from Mr. Curley to himself in an attempt to stop Plaintiff's project. *See* Dkt. No. 41-30 at 97. Defendant Longway's purported motivation was that Plaintiff's subdivision was going to be competing with his undeveloped tract of land. *See id.* at 97. Plaintiff thinks that Defendant Longway's involvement included telephone conversations between Defendant Longway and Mr. Curley, but Mr. Javarone is admittedly speculating. *See id.* at 101. Mr. Javarone theorizes that he cannot think of any other reason Defendant Longway and Mr. Curley would have to speak except for conversations surrounding an attempt to stop Plaintiff's subdivision. *See id.* at 101. However, as the Town Supervisor, Defendant Longway had to speak with Mr. Curley whenever the Town had water problems, including water main breaks or disinfectant byproduct problems. *See* Dkt. No. 41-26 at 99. Moreover, Mr. Javarone does not believe that Mr. Curley would have conspired

with Defendant Longway to impede the Emerald Acres subdivision, and he also thinks that Mr. Curley would have required the Type-I SEQR review regardless of any involvement from Defendant Longway. *See* Dkt. No. 41-30 at 101.

During the time that Emerald Acres was seeking approval from the DOH, Mr. Curley thought that if a town acts as the lead agent in completing the appropriate SEQR review, then the DOH is able to check off that the proper review was performed. *See* Dkt. No. 41-14 at 26. Whether a Type-I and Type-II SEQR review needed to be performed was at issue in this case. *See* Dkt. No. 41-30 at 90-91. A Type-I review requires the submission of the long form and requires a coordinated review with other agencies as compared to a Type-II review, which requires the submission of the short form and does not involve a coordinated review with other agencies. *See* Dkt. No. 41-40 at 91. The coordinated review involves sending out forms to other state agencies for their opinion on the environmental impact. *See* Dkt. No. 41-14 at 83-84. If the town does not perform the appropriate SEQR review – as was the case here according to Mr. Curley, then the DOH has to revisit SEQR as the lead agent and issue its own decision because the DOH has an independent obligation to complete a Type-I SEQR review for all subdivisions. *See id.* at 27-28, 55. Mr. Curley acknowledged that he was not aware in 2010 of all the laws and regulations about the ability of a Planning Board to revise its previous determinations. *See id.* at 28-29.

Mr. Javarone expressed that did not believe that a town engineer was going to be necessary because there was conditional, final approval, but Mr. Curley started advising him in September 2010 that the Town's consulting engineering firm would need to be involved. *See id.* at 35, 59. During a telephone call on December 10, 2010, the DOH advised Mr. Javarone that the town engineering firm needed to be involved with the subdivision approval before any

applications were made to the DOH. *See id.* at 33-34. It was Mr. Curley's view that the town engineer needed to be involved in every water application in order to streamline the application process. *See id.* at 35. In that telephone conversation, Mr. Javarone was told that there was information that had to be submitted before the DOH would be able to give its approval, including information on the water system, the sewer system, and a Type-I SEQR review. *See id.* at 36-37. At that time, Mr. Curley thought that the Planning Board should go back and revisit the SEQR review. *See id.*

On April 29, 2011, Mr. Javarone continued to object to the SEQR classification by the DOH because it was his opinion that the Planning Board had already made a SEQR determination. *See id.* at 57, 65. However, the DOH held the opinion that Defendants' misapplication of the SEQR regulations was irrelevant to its review of Plaintiff's realty subdivision. *See id.* at 57, 77. He informed Mr. Javarone that he would not sign off on approval of the subdivision unless Plaintiff complied with the DOH's rules and regulations and complete a Type-I SEQR review. *See id.* at 59-60, 69. Mr. Curley was aware that his requirements were in conflict with the Planning Board, but he believed that the Planning Board could revisit the SEQR classification and review the subdivision under the proper Type-I classification. *See id.* at 60, 69-71. When Plaintiff offered to complete the Type-I review with the DOH, Mr. Curley advised Plaintiff that the Defendant Town needed to perform the review. *See* Dkt. No. 41-30 at 148. In any event, Mr. Curley believed that the DOH was not obligated to accept the Planning Board's classification or approval of the project. *See* Dkt. No. 41-14 at 72-73. He testified that the "DOH hierarchy" supported his decisions throughout this relevant period, and it determined to hold firm on this requirement. *See id.* at 66-67, 69-71.

On May 11, 2011, Mr. Javarone met with Mr. Curley at the DOH. *See id.* at 78. At that meeting, Mr. Javarone expressed his belief that Defendants were trying to stop the development of his subdivision. *See id.* at 80. He claims that Defendant Longway "has told everybody and their brother that it's not a right fit for his town." *See id.* The DOH did not share Plaintiff's belief but, instead, thought that the Town only wanted to follow the correct procedure in the development. *See id.* at 82.

In May 2011, Plaintiff filed a petition pursuant to Article 78 of New York Civil Procedure Laws and Rules ("Article 78") against the DOH. *See* Dkt. No. 41-14 at 61. Sometime after that petition was filed but before November 8, 2012, there was a DOH conference, including Mr. Curley, the DOH legal counsel, and the "DOH heirarchy," where the DOH concluded that the Planning Board did not have the authority to go back and perform a corrected SEQR review. *See id.* at 61, 84. It was also determined that the DOH should take on the responsibility of conducting a Type-I SEQR review. *See id.* at 84. The DOH acted as the lead agent, and it did not issue approval until the Type-I review was completed. *See id.* at 83, 85. The DOH altered the project description, completed the environmental assessment form, distributed the forms to interested agencies, collected the agencies' responses, reviewed the submitted documents, and issued a determination. *See id.* at 83-86. Although the DOH's opinion on the ability of the Planning Board to revisit the SEQR classification changed, the DOH never changed its opinion that a Type-I SEQR review was required for the DOH's approval. *See id.* at 84. On November 8, 2012, the DOH issued approval on the Type-I SEQR review with a negative declaration. *See id.* at 83; Dkt. No. 46-36.

In April 2012, Plaintiff also filed a hybrid action pursuant to Article 78 and Section 3001 of New York Civil Procedure Laws and Rules against Defendants seeking an annulment of

Defendant Longway's official acts, which was withdrawn, and an injunction compelling Defendants to sign the application, as the presumed owners of the water and sewer improvements, to the DOH and DEC for approval of the water and sewer engineering plans. *See* Dkt. Nos. 41-33; 46-34. Defendants argued in that case that Plaintiff had not complied with the conditions placed upon approval. *See* Dkt. No. 46-34 at 3. New York Supreme Court (Merrell, J.) explained that the signing of the application by the Town for approval by the DOH and DEC does not waive Plaintiff's obligations to fulfill the conditions required prior to commencement of building. *See id.* at 3. Subsequent to this Article 78 proceeding, the DOH required an additional submission by the Town before approval could be given. *See* Dkt. No. 41-14. at 87. In February 2013, the DOH required a letter, which would specifically acknowledge the Town's intention to accept ownership of the public water main. *See id.* at 88-89.

Mr. Javarone does not believe that Plaintiff's subdivision was delayed by the actions of the DOH but, instead, believes that the DOH's "actions were perpetuated by the town, so [he] think[s] that it was the town's actions that were causing any delays." Dkt. No. 41-30 at 150. Specifically, Mr. Javarone thinks that the delay occurred when Defendant Town would not sign the water application indicating that the Town would take ownership of the water infrastructure after it was built. *See* Dkt. No. 41-30 at 141, 151-54. Mr. Javarone does not think that there was any delay caused by the DOH's error. *See id.* at 154, 158-60. In fact, Mr. Javarone does not think that his project was impacted in any way by the DOH's requirement of a Type-I SEQR review, which, as noted, was completed in November 2012. *See* Dkt No. 41-14 at 83; Dkt. No. 41-30 at 154. Further, Mr. Javarone does not believe that Mr. Curley's request for a Type-I SEQR review was based on incorrect information provided by Defendants. *See* Dkt. No. 41-30 at 154.

Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 41.

### III. DISCUSSION

**A.** **Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines "that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). The moving party must identify the basis for the motion as well as those portions of the record which demonstrate that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If "a properly supported motion for summary judgment is made," then the burden of production shifts to the non-movant to "set forth specific facts showing that there is a genuine issue" of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). In assessing the record to determine whether a genuine issue of material fact exists, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36. A party opposing a motion for summary judgment may not simply rely on the assertions in its pleading, but rather must "by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c), (e)).

**B.** **42 U.S.C. § 1983**

"Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting 'under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory.'" *Gomez v. Toledo*, 446 U.S. 635, 638 (1980) (quoting 42 U.S.C. § 1983); *see also Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005). "It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere". *Morris-Hayes*, 423 F.3d at 159; *see also Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Accordingly, the first part of any analysis for a Section 1983 claim is to identify the constitutional right alleged to have been violated. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Baker v. McCollan*, 443 U.S. 137, 140 (1979).

## C.     Equal Protection Clause

Plaintiff alleges that Defendants violated its rights under the Equal Protection Clause of the Fourteenth Amendment. *See* Dkt. No. 1 at ¶¶ 85-105. Plaintiff claims that Defendants' treatment of its approved, single-family subdivision was both harmful and different from Defendants' treatment of the Liberty townhouse complex, a similarly situated subdivision. *See id.* Plaintiff claims that Defendants were motivated to harm Plaintiff's subdivision. *See id.* at ¶¶ 84-105. Specifically, Plaintiff compares Emerald Acres with the Liberty residences. *See id.* Plaintiff alleges that, as a result, its single-family subdivision, Emerald Acres, was excessively delayed and incurred additional expenses, including unnecessary engineering fees. *See id.* at ¶¶ 92-93, 103-05. Plaintiff proceeds on these claims under the theories of "class-of-one" and selective enforcement. *See id.* The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." *See* U.S. Const. amend. XIV, § 1. The Supreme Court has interpreted this to mean "that all persons similarly situated should be

treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Typically an equal protection claim is brought by a member of a vulnerable class, who alleges discrimination based upon that membership. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). However, "the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Id.*; *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "To state an equal protection claim, a plaintiff must charge a governmental officer 'not only with deliberately interpreting a statute against the plaintiff, but also with singling him out alone for that misinterpretation.'" *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988)). "Where, as here, a plaintiff does not claim to be a member of a constitutionally protected class, he may bring an Equal Protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'" *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013).

### 1. Selective Enforcement

Although "equal protection does not require that all evils of the same genus be eradicated or none at all," the Equal Protection Clause prohibits the selective enforcement or prosecution by a state official pursuant to a lawful regulation. *See LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980). The "[m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." *Id.* (citing *United States v. Rickenbacker*, 309 F.2d 462, 464 (1962)). In order to make out an equal protection claim based upon selective enforcement, a plaintiff must establish that:

> "(1) the person, compared with others similarly situated, was
> selectively treated, and (2) the selective treatment was motivated by
> an intention to discriminate on the basis of impermissible
> considerations, such as race or religion, to punish or inhibit the

14

> exercise of constitutional rights, or by a malicious or bad faith
> intent to injure the person."

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*,

960 F.2d 6, 10 (2d Cir. 1992)).

In a selective enforcement claim, "plaintiffs 'must identify comparators whom a prudent

person would think were roughly equivalent[, but] [p]laintiff[s] need not show an exact

correlation between [themselves] and the comparators.'" *Mosdos Chofetz Chaim, Inc. v. Village

of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (quoting *Abel v. Morabito*, No. 04 Civ

07284, 2009 WL 321007, *5 (S.D.N.Y. Feb. 10, 2009)). "Put another way: 'The test is whether a

prudent person, looking objectively at the incidents, would think them roughly equivalent and the

protagonists similarly situated. . . . Exact correlation is neither likely or necessary, but the cases

must be fair congeners.'" *Id.* (quoting *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d

455, 463 (E.D.N.Y. 2002)).

The Court finds that Emerald Acres and Liberty Acres are not "roughly equivalent" or

"similarly situated" as required in a selective enforcement claim. The subdivision approval for

the Liberty townhouse complex required and followed a different procedure than Plaintiff's

subdivision, and the properties are located in different zoning districts. Plaintiff's property is

located in a commercial zone, *see* Dkt. No. 41-30 at 35, and the proposed Liberty townhouse

complex is located in an agricultural residential zone.[4] *See* Dkt. No. 41-7 at 4*;* Dkt. No. 41-11 at

37. As a result, Liberty and Emerald Acres were proposed with significantly different residential

development plans. Emerald Acres was approved as single-family dwellings that were

---

[4] In some parts of the record, the Liberty property is described as being "farm-zoned
commercial." *See* Dkt. No. 41-26 at 16. The determining factor for the Court is not necessarily
the zoning of the property but the different procedures required of the two different
developments.

townhouses with subdivided property lots. *See* Dkt. No. 41-12 at 62; Dkt. Nos. 46-17, 41-8. Whereas, the Liberty townhouses were approved as apartment or townhouse complexes and did not involved the subdivision and creation of individual lots. *See* Dkt. No. 41-12 at 63. Also, the Liberty townhouses were subject to an additional site plan review and approval from the County, and Emerald Acres was subject to the Town Planning Board's approval as a subdivision. *See* Dkt. No. 41-13 at 30.

The classification as a single-family dwelling as opposed to a multi-family dwelling had an impact on the water and sewer utility ownership, among other things. *See* Dkt. No. 41-17 at 50. According to the Town Engineer, the water and sewer improvements for service to individually-owned parcels of property are required to be publicly operated, meaning the Town is required to oversee construction and accept ownership upon satisfactory completion. *See* Dkt. No. 41-17 at 50-51, 71; Dkt. No. 46-18 at 23-25. However, townhouse complexes, or multi-dwelling residences, within the Town water and sewer districts are not required to have town-operated facilities. *See* Dkt. No. 41-17 at 50. The determining factor is whether there is a creation of individual parcels of property like Emerald Acres. *See* Dkt. No. 41-17 at 50, 71. According to the Article 78 Court, if the water system improvement is going to be privately owned, then the owner would have to establish a waterworks corporation under New York Transportation Corporation Law § 42, and, once established, the waterworks corporation would seek the approval from the DOH and the DEC. *See* Dkt. No. 46-34. In comparison, if the water system improvement is going to be publicly owned by the local municipality, then the developer must submit an engineered plan for the water system improvement to the local municipality and request that the municipality take ownership of the improvement after completion. *See* Dkt. No.

46-34.  The municipality is then responsible for obtaining approval from the DOH and DEC.  *See id.*

Additionally, the Liberty property is not the same size as the approved development on Emerald Acres, the Liberty subdivision was approved in 2006 while Emerald Acres was approved in 2010, and Liberty underwent a Type-I SEQR review by Defendant Town prior to approval. *See* Dkt. No. 41-14 at 103; 46-47 at ¶¶ 19, 45.  Although the subdivisions may have similar densities, that one common factor put forth by Plaintiff is not enough for a reasonable jury to find that the two properties at issue in this case were "fair congeners" or similarly situated.  The Court finds that the undisputed facts legally preclude a finding of similarity that could sustain a selective enforcement claim.[5]

In the alternative, the Court also finds that Plaintiff has not submitted any evidence beyond conjecture to support that Defendants acted with a malicious or a bad-faith intent.  The Second Circuit has recognized that "cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are 'lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply.'"  *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).  It is clear, however, that a plaintiff must allege more than mere conclusory allegations or speculation to establish malicious or bad faith intent on behalf of a defendant to harm the plaintiff.  *See Harlen Assocs.*, 273 F.3d at 502; *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d at 17 (granting defendants summary judgment on the plaintiff's selective enforcement claim

---

[5] The Court notes that the development of the Liberty townhouses never progressed beyond the conditional approval stage, which precludes a comparison of the Town's procedure beyond that point in the development of the subdivisions.  *See* Dkt. No. 46-47 at ¶¶ 46-47.

where the plaintiff's assertion of impermissible motive was "sheer 'conjecture and speculation'" (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998))). "Although the issue of whether an action was motivated by malice generally is a question of fact properly left to the jury, [the court] will uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims." *Harlen Assocs.*, 273 F.3d at 502.

In this case, Plaintiff does not allege that it was subject to selective enforcement by Defendants based upon race, religion, or to prevent him from exercising a constitutional right, but, instead, Plaintiff claims that Defendants acted with willful, bad-faith intent to harm Plaintiff. *See* Dkt. No. 1. Defendants established that Plaintiff's allegations of malice are based on speculation, and, in opposition, Plaintiff has not come forward with any evidence or the suggestion of evidence to establish more than sheer conjecture and speculation that Defendants acted with the required intent. Mr. Javarone believed that Defendant Longway did not support Plaintiff's subdivision based upon Defendant Longway's offer to sell his property. *See* Dkt. No. 41-30 at 56. Mr. Javarone characterized this offer to sell as a "shake-down" even though it was mentioned only one time, and Defendant Longway did not ever threaten to impede Plaintiff's project if Mr. Javarone did not buy his property. *See id.* at 163. According to Mr. Javarone, Walter VanTassel, a member of the Planning Board and the Town's building inspector, explained to him that the subdivision's issues were because he did not buy Defendant Longway's property, but Mr. Javarone was not ever informed of the basis for that belief. *See id.*; Dkt. No. 41-13 at 4-7. Mr. Javarone believed that Defendant Longway was a "bully, and if he didn't like something, he wasn't going to let it happen." *See* Dkt. No. 41-30 at 56. Mr. Jaravone acknowledges that he did not have any personal experiences with Defendant Longway that formed this impression. *See id.*

at 56-57. Mr. Javarone thinks that perhaps someone told him or he read in a newspaper that Mr. Longway was a bully, but he does not recall. *See id.* at 57.

According to Mr. VanTassel, Defendant Longway said it was foolish to set aside land in a different town to satisfy the Town of Pamelia's Law of Subdivisions. *See* Dkt. No. 41-13 at 46. However, Defendant Longway did not ever suggest to Mr. VanTassel to act against Plaintiff's subdivision. *See id.* at 46. The land set aside is contained in the Town of Pamelia Subdivision Law § 701(4) requirement for cluster subdivisions allowing for higher density of residences if land is set aside for green space. That Law does not designate where the set aside of land must be located and, therefore, Plaintiff was permitted to set aside land in a different town. *See* Dkt. No. 41-8 at 1. Defendant Longway asked Mr. VanTassel to change the laws in the Town to prevent this occurrence in the future. *See* Dkt. No. 41-13 at 47.

Mr. VanTassel's belief that Defendant Longway was against Plaintiff's subdivision because he wanted to sell his property was only an "assumption." *See id.* at 76. Likewise, Mr. VanTassel made an "assumption" that Defendant Longway did not want to re-appointment him in 2014 because he gave permits and certificates of occupancy on Plaintiff's project. *See id.* at 84-88. Mr. VanTassel was asked about his statement, which was recorded by Mr. Javarone, in November 2012 that "[a] long time ago, Larry said there is no Goddamn way he's going to build that down there. And that's where the problem is laying." *Id.* at 82. Mr. VanTassel explained that Defendant Longway did not make that statement to him directly, and he does not recall who told him the story. *See id.* at 82.

Based on the evidence in the record, Plaintiff does not have anything more than Mr. Javarone's suspicions and Mr. VanTassel's assumptions that Defendant Longway was trying to impede Plaintiff's subdivision. Accordingly, it is appropriate in these circumstances to grant

19

summary judgment in Defendants' favor because there is no evidence that Defendants acted with a malicious or bad faith intent to harm.

### 2. Class of One

The Supreme Court has recognized equal protection claims brought by a "class of one" where a plaintiff was intentionally treated differently from others similarly situated and "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Clubside v. Valentin*, 468 F.3d 144, 158-59 (2d Cir. 2006). In the Second Circuit, a class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside*, 468 F.3d at 159; *see also Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010). This stringent standard exists because the similarity is offered to support "'an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain.'" *Clubside*, 468 F.3d at 159 (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)). Accordingly, the plaintiff and the comparator must be "*prima facie* identical in all relevant respects."[6] *Neilson*, 409 F.3d at 104.

The Second Circuit has "deem[ed] that test to require a plaintiff in . . . a 'class of one' case to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a

---

[6] Although "there is disagreement within the Second Circuit regarding the precise standard for determining whether comparators are similarly situated for [selective enforcement and 'class of one'] claims," *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011), this Court has previously expressed its agreement with those courts that have employed a more demanding standard of similarity for "class of one" claims than for selective enforcement claims, *see Norwood v. Salvatore*, No. 3:12-CV-1025, 2014 WL 203306, *6-7 (N.D.N.Y. Jan. 17, 2014).

legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* (citing *Olech*, 528 U.S. at 565). Whether property is "prima facie identical" is usually a fact-intensive inquiry for the jury, but where no reasonable jury could find that the property is similarly situated, summary judgment is appropriate. *Clubside*, 468 F.3d at 159; *Harlen*, 273 F.3d at 499 n.2 (2d Cir. 2001).

The Court, applying this more stringent standard of similarity, finds again that the two developments were not "prima facie identical" to established this claim. For all the reasons already discussed and considered under Plaintiff's claim based on a selective enforcement theory – including the different zoning classifications, the type of residences, and the required procedure for obtaining the DOH approval, the Liberty property is not similar to Plaintiff's Emerald Acres as a matter of law. Therefore, the undisputed facts legally preclude a finding of similarity that could sustain a class of one claim.

**D.    Due Process Rights**

The Due Process Clause of the Fourteenth Amendment of the Constitution provides protections against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. It has been long settled that this protection extends to property rights and not just personal rights. *See Sullivan v. Town of Salem*, 805 F.2d 81, 83 (2d Cir. 1986) (citing *Lynch v. Household Fin. Corp.*, 405 U.S. 538 (1972)) (stating that the rights sought to be protected included "the right to acquire and possess property of every kind"). Plaintiff alleges that it possessed a property interest protected under the Due Process Clause of the Fourteenth Amendment to pursue the development and marketing of its approved, single-family subdivision without interference. *See* Dkt. No. 1 at ¶¶ 115-121. Plaintiff claims that Defendants' attempts to "undermine, negate, and delay" the

subdivision after the Town Planning Board gave its conditional final approval was a violation of its substantive and procedural due process rights. *See id.* at ¶ 118.

"To demonstrate a violation of due process rights based upon a zoning decision , whether procedural or substantive, a plaintiff must first demonstrate the possession of a federally protected property right to the relief sought." *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 236 (E.D.N.Y. 2009) (citing *Lisa's Party City*, 185 F.3d at 16). Only after a federally protected property right is established do the courts then discuss "the second prong of the due process analysis, i.e., the sufficiency of any state remedy (in the context of a procedural due process claim) . . . or, the nature of Defendant's conduct (in the context of a substantive due process analysis)." *Id.* at 237. The existence of a protected property interest in a benefit is a matter of law and, therefore, determined by the court in almost all cases. *See id.* at 238 (citing *RRI Realty Corp. v. Incorporated Village of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989)); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

The Second Circuit has applied "a 'clear entitlement' analysis to determine whether a landowner has a constitutionally cognizable property interest in the benefit sought." *Clubside*, 468 F.3d at 152 (quoting *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995)); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Second Circuit has also described the analysis as a "legitimate claim of entitlement." *See Clubside*, 468 F.3d at 153 (quoting *Walz*, 46 F.3d at 168). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

"[A] landowner has a clear entitlement to the land-use benefit sought where, 'absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the

application would have been granted.'" *Clubside*, 468 F.3d at 152 (quoting *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985)). The "certainty" or "very strong likelihood" analysis "must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case." *Id.* at 152-53. If the permit or license sought must be issued "upon ascertainment that certain objectively ascertainable criteria have been met," then there is a clear entitlement. *See Natale*, 170 F.3d at 263. The Second Circuit held that "the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest." *Id.* at 153 (stating that there is a strong likelihood "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured").

Further, the uncertainty analysis is not limited to an evaluation of discretion conferred on an agency. In the context of land use, the Second Circuit has also found that "forms of 'uncertainty' in the application process preclude the finding of a protectable property interest." *Clubside*, 468 F.3d at 153. Accordingly, "in order to establish a federally protectable property interest in a state or local permit for which a plaintiff has applied, the plaintiff must show that, at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case." *Id.* (internal quotation marks omitted) (quoting *Natale*, 170 F.3d at 263). This uncertainty standard prevents the federal courts from sitting as a zoning board of appeals, and it also prevents the federal courts from being the interpreters of local and state land use regulations. *See Natale*, 170 F.3d at 263; *Yale*, 758 F.2d at 58.

In this case, Plaintiff claims that it had vested property interests in the following benefits: (1) the conditional, final approval for Emerald Acres by the Planning Board, (2) a letter indicating

that the Town will accept ownership of the Emerald Acres' water improvement, (3) a signed application from the Town to the DOH for approval of the water system, and (4) certificates of occupancy and building permits from the Town.  *See* Dkt. No. 46-48 at 23-27.  With regard to Plaintiff's claimed property interest in the conditional approval for Emerald Acres by the Planning Board, the Court finds that it is undisputed that Plaintiff had conditional approval from the Planning Board, and the approval was never rescinded or vacated despite Plaintiff's allegations that Defendants' tried to change meeting minutes.  Accordingly, Plaintiff fails to show that it was deprived of that benefit.

However, the Court could view Plaintiff's claimed property interest to be more narrow than the Planning Board's approval.  *See Puckett*, 631 F. Supp. 2d at 238 (identifying Plaintiff's property interest more narrowly than the general interest in obtaining a building permit). Ostensibly, Plaintiff is claiming that the Planning Board tried to redo the SEQR review as a Type-I action after it was already was approved under a Type-II action.  Therefore, Plaintiff's benefit at issue in this due process claim is that Plaintiff was entitled to the DOH's approval without a Type-I review by Defendants.

Defendants argue that they had no control over the DOH's actions and requirements for the DOH's approval, and they merely attempted to comply with the DOH's stated requirements placed upon them.  *See* Dkt. No. 41-3 at 19-20.  Further, according to Defendants, the evidence does not support that Plaintiff had a property interest that qualifies as "clear entitlement" as a matter of law.  *See id.* at 22-23.  The Court agrees on both points.  The undisputed facts are that Mr. Curley, a DOH engineer, advised the Parties that the SEQR review that was performed by the Planning Board was not performed under the appropriate classification and that the Planning Board needed to reopen the application and perform a Type-I review before the DOH could act.

*See* Dkt. No. 41-15 at 60, 69-71; Dkt. No. 41-30 at 148. The DOH also advised Defendant Longway that the plans and specifications for the water main distribution extension for the development should be submitted to the DOH following review by the municipality's engineering firm. *See* Dkt. No. 41-15. Mr. Curley also advised Defendants that the Town would be required to take ownership of the water main after it was certified as installed in accordance with the approved plans and specifications. *See id.* Defendant Longway was told by the DOH that the Planning Board acted prematurely by granting final approval and that final approval should not occur until the final plan had been reviewed by the DOH. *See id.*

The Chairperson of the Planning Board, who has been a member of the Planning Board since its inception, estimates that the Planning Board has approved only six major subdivisions in the Town of Pamelia. *See* Dkt. No. 41-12 at 132. After receiving the DOH letter, the Chairperson was concerned that they did not follow the correct procedure. *See id.* at 111-12. It was also the DOH's position that a Type-I SEQR review had to be performed in order to obtain the DOH's approval of the water main extension. *See* Dkt. No. 41-14 at 85; Dkt. No. 41-15. In response, members of the Planning Board unsuccessfully attempted to vacate the previous SEQR review in order to perform a Type-I review. *See* Dkt. No. 41-20. At a Planning Board meeting on April 6, 2011, Town of Pamelia Attorney David Renzi presented that the proper SEQR review was not performed prior to the conditional, final approval on October 20, 2010. *See* Dkt. No. 41-20. Mr. Renzi explained, pursuant to the DOH's directive, that other agencies involved were not able to act until the Planning Board performed the correct review. *See id.* Several ideas were proposed, including the changing of the minutes from the October 20, 2010 approval, which was voted down. *See id.* In the end, it was agreed between Attorney Renzi and Planning Board

Member Walter VanTassel to send a letter to Plaintiff with the Type-I form and invite it to reapply. *See id.*

The DOH continued to enforce its position until Plaintiff commenced an Article 78 proceeding in May 2011 compelling DOH to approve Plaintiff's application under the Type-II classification. *See* Dkt. No. 41-16 at 10. As a result, the DOH rescinded its position that the Town was required to perform a Type-I review. *See* Dkt. No. 41-14 at 61, 84. Instead, the DOH took the lead and performed its own Type-I review. *See id.* at 83, 85. The DOH acknowledged that it may not be able to require the Town to revisit the SEQR review when there is no pending application, but its opinion that the Type-I review needed to be performed never changed. *See id.* at 84. Although Plaintiff directs this claim against Defendants, Plaintiff always had conditional approval from the Planning Board, and Defendants acted to comply with the DOH in order for Plaintiff to obtain the DOH's approval. The Court finds that, under these circumstances, there was uncertainty in the process of obtaining the DOH's approval, one of the conditions for subdivision approval. The Town was uncertain as to the following: (1) the appropriate SEQR classification, (2) the entity responsible for performing that review, (3) the authority of the DOH to direct the Town to reopen a past review, and (4) the authority and ability of the Planning Board to perform a revised review after final, conditional approval was given. Accordingly, Plaintiff had no clear entitlement to an approval without delay due to the Planning Board's attempt to complete a Type-I SEQR review.

Plaintiff also claims a property interest in the benefit of the Town accepting ownership of the water improvement system after completion. *See* Dkt. No. 46-48 at 25. There are several procedural steps prior to the acceptance of a water system by a local municipality, and Plaintiff claims that it was entitled to have these acts completed toward the Town's acceptance. Among

26

these acts, Plaintiff argues that it was entitled to have to have the Town sign the DOH application for approval of the water system improvement project as the owner of the system and to have the Town submit a letter to the DOH indicating that the Town will accept the water improvement system from Plaintiff after completion. *See* Dkt. No. 46-48 at 25. Plaintiff claims that Defendants delayed its project by not undertaking these two acts sooner. Defendants did not want to sign the application or the letter indicating that it was willing accept ownership because its requirements for the water system plans had not been satisfied. *See* Dkt. No. 46-34 at 3. Specifically, the Town Board was concerned about Plaintiff's installation of the utility lines crossing over property lines, the placement of the utility lines underneath pavement instead of dirt, and the material supporting the utility lines. *See* Dkt. No. 41-17 at 60; Dkt. No. 41-26 at 117, 123-24, 133, 140.

Plaintiff would have the Court find that when it received conditional, final approval from the Town Planning Board that Defendants had no further discretion in accepting ownership. However, only the Town Board can accept a dedication of infrastructure. *See* Dkt. No. 41-26 at 131. Section 660 of the Town of Pamelia Subdivision Law specifically authorizes the Town Board to accept roads or facilities of a subdivision by resolution. *See* Dkt. No. 46-18 at 25. The local law states that the Town Board "may" proceed to accept a facility; the law does not use the mandatory language *shall* accept. *See id.* at 25. The idea that the Town Board does not have discretion or that its authority to accept ownership and maintenance was merely a ministerial act is contradictory to the local law's use of the word "may." *See Sullivan*, 805 F.2d at 84.

In *Sullivan*, the plaintiff claimed that he was deprived of property when the town delayed accepting ownership of the roads he constructed. *See id.* However, the Second Circuit found that, where the statute authorizing the dedication of the roads uses the term "may," the

27

municipality acts with discretion. *See id.* As a result, the plaintiff in that case lacked "any legitimate expectation or entitlement to have the additional roads ultimately accepted." *Id.* The Court finds that the Town Board had the authority to act at its discretion to accept Plaintiff's water improvement in Emerald Acres. Plaintiff did not have a clear entitlement to these benefits and, therefore, there is no federally protected interest.

Plaintiff also claims that "Defendants' response to the issuance of building permits is another example of the Town's utter disregard for performing ministerial acts." Dkt. No. 46-48 at 25-26. Plaintiff makes a similar statement about the certificates of occupancy. *See id.* at 26. Plaintiff does not claim or submit any evidence that it was deprived of or delayed in receiving building permits and certificates of occupancy. *See id.* at 25-27. In certain circumstances, a party can be entitled to permits and certificates of occupancy, such that denial is a deprivation of property. *See Sullivan*, 805 F.2d at 85. In this case, it is undisputed that Plaintiff received his building permits and certificates of occupancy. *See* Dkt. No. 41-13 at 84-86; Dkt. No. 41-30 at 185. The building inspector issued the building permits in November 2012, when he thought that the conditions were met. *See* Dkt. No. 41-13 at 84-85. Although there is some testimony from the building inspector that the Town Board was not happy that the building permits had been issued, any alleged unhappy sentiments occurred after they were already issued. *See id.* at 84.

Under these undisputed facts, the Court finds that Plaintiff did not have a clear entitlement to the benefits claimed, and, therefore, Plaintiff did not have a federally-protected property interest as a matter of law.

**E.    Conspiracy**

Plaintiff alleges that "Defendants conspired with and among each other, and with defendant Town of Pamelia's Town Attorney Renzi, Town Engineer Dimmick, and other Town

officials, to violate and deprive Plaintiff's rights to equal protection and due process."  *See* Dkt. No. 41-4 at ¶¶ 122-127.  As a result, Plaintiff claims that it was deprived of these rights in violation of 42 U.S.C. § 1985 ("Section 1985" or "§ 1985").  *See id.* at ¶ 126.  "Section 1985(3) prohibits conspiracies that are intended to deprive 'either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (quoting 42 U.S.C. § 1985(3)).

> To state a claim for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must allege four elements: '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'

*Dolan v. Connolly*, 2014 WL 1876524, *12 (S.D.N.Y. May 8, 2014) (quoting *United Bhd. of Carpenters and Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)); *see Vega v. Artus*, 610 F. Supp. 2d 185, 204 (N.D.N.Y. 2009).

To state a sufficient claim on the second element, "[t]he conspiracy must be motivated by racial or related class-based discriminatory animus."  *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996); *see Vega*, 610 F. Supp. 2d at 204; *Martin v. New York State Dep't of Corr. Servs.*, 115 F. Supp. 2d 307, 316 (N.D.N.Y. 2000) (explaining that the Supreme Court interpreted the language of Section 1985(3) to require "'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971))).  "In this context, 'class-based animus' encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex." *Vega*, 610 F. Supp. 2d at 204 (quoting *Martin*, 115 F. Supp. 2d at 316 (internal quotations

omitted)). "'[T]he statute should extend beyond its racial boundaries only when a class has been afforded suspect or quasi-suspect classification or when Congress has provided the class special protection.'" *Vega*, 610 F. Supp. 2d at 204 (quoting *Martin*, 115 F. Supp. 2d at 316). In this case, Plaintiff does not allege or produce any evidence that it is a member of any class, race-based or otherwise. Accordingly, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim under § 1985(3).

In Plaintiff's memorandum of law in opposition to summary judgment, it argues that there are material questions of fact that Defendants engaged in a § 1983 conspiracy.[7] *See* Dkt. No. 46-48 at 28-29. A conspiracy under § 1983 requires (1) an agreement between a state actor and a private party or two or more state actors; "(2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *see also Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). The two essential terms of § 1983 claim are (1) an act under the color of state law and (2) a deprivation of a right secured under the Constitution as a result of that act. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970). Accordingly, in order to have a valid § 1983 conspiracy claim, a plaintiff must prove an actual constitutional violation. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes*, 398 U.S. at 150) ("[T]he lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right."). Here, Plaintiff's claims of constitutional violations did not withstand Defendants' motion for summary judgment. Without a surviving constitutional violation claim, Plaintiff is unable to maintain a valid conspiracy claim under § 1983.

_____

[7] The Court notes that Plaintiff has not alleged a Section 1983 conspiracy in its complaint. *See* Dkt. No. 1. To the extent that this claim could be interpreted from the complaint, the Court will address this claim.

Moreover, even if Plaintiff had a surviving constitutional violation claim, conclusory or vague allegations that Defendants engaged in a conspiracy "are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)). The Second Circuit held that without "any details of time and place" the defendants were deprived of being able to intelligently prepare a defense. *See id.* (internal quotations marks and citations omitted). In this case, there was no evidence adduced to support a concerted act by Defendants, such that a reasonable jury would be able to find Defendants engaged in a conspiracy.

**F.     Tortious Interference with a Contract**

Plaintiff's sixth claim alleges tortious interference. *See* Dkt. No. 1 at ¶¶ 128-33. Specifically, Plaintiff claims that Defendants knew or should have known that Plaintiff intended to lease or sell the townhouses in its subdivision, and Defendants actions "thwarted and delayed" Plaintiff's plans to make the homes available for occupancy, depriving Plaintiff of reasonably anticipated revenues and profits. *See id.* The Court notes that Plaintiff's complaint entitled this claim as "Tortious Interference with Contract" but the substantive allegations in the complaint are for a claim of tortious interference with prospective business relations. *See* Dkt. No. 1. The Court will address both. Under New York law, the elements of tortious interference with contract are (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); *see also AIM Intern. Trading, L.L.C. v. Valcucine S.P.A., IBI, L.L.C.*, No. 2 Civ. 1363, 2003 WL 21203503, *6-7 (S.D.N.Y. May 22, 2003). Thus, to have a valid claim for tortious

interference with a contract, the existence of a valid contract is required. *See Lama Holding*, 88 N.Y.2d at 424. Defendants assert that Plaintiff's claim for tortious interference should be dismissed because there is no evidence in the record that Plaintiff ever had contractual relations between itself and a third party for the purchase or lease of its future townhomes. *See* Dkt. No. 41-3 at 27. The Court finds that the record is void of evidence that Plaintiff ever had any contractual relations between itself and any third-party purchasers or lessees. In opposition, Plaintiff does not identify any evidence of contractual relationships. Accordingly, dismissal of this claim is appropriate.

To the extent that Plaintiff meant to allege a claim for tortious interference with prospective business relations, Defendants did not specifically seek dismissal of this claim in their motion papers presumably due to the improper caption in Plaintiff's complaint. *See id.* However, the Court finds that Defendants' motion papers were clearly seeking complete summary judgment dismissing all the claims in Plaintiff's complaint, including Plaintiff's sixth cause of action for tortious interference. *See* Dkt. Nos. 1, 41. As noted, Defendants argue there is no evidence that Plaintiff has contractual relations with any third party. *See* Dkt. No. 41-3 at 27. After reviewing the allegations in Plaintiff's complaint, the Court finds that the complaint fails to state a claim for tortious interference with prospective business.[8]

---

[8] The Court finds that Defendants' motion for summary judgment placed Plaintiff on notice that its tortious interference claim is subject to dismissal. In the alternative, the Court would grant summary judgment on this claim *sua sponte*. "'District courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*.'" *Biosafe-One, Inc. v. Hawks*, 379 Fed. Appx. 4, 8 (2d Cir. 2010) (quoting *First Financial Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir. 1999)). The "deficiency in notice does not undermine the district court's ruling if the lack of notice causes no prejudice." *Id.* at 8-9. Here there is no prejudice to Plaintiff because the complaint fails to state a claim for which relief can be granted. Further, amendment of the complaint would not rectify the deficiency because there is no evidence in the record to support a claim for tortious interference with prospective business.

> "Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship."

*Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 177 (W.D.N.Y. 2003) (quoting *Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000)). The mere suspicion of tortious interference with a prospective business relationship is not enough to establish a claim. *See Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003). The plaintiff must allege "interference with a specific identified business relationship with a third party." *Am. Building Maintenance Co. of N. Y. v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 316 (N.D.N.Y. 2007) (quoting *Camp Summit of Summitville, Inc. v. Visinski*, No. 06-CV-4994, 2007 WL 1152894, *14 (S.D.N.Y. Apr. 16, 2007)). A claims fails where a plaintiff does not allege both that the defendant knew of the business relationship with a third party and that the defendant intentionally interfered with that business relationship. *See id.* The failure to identify a specific business relationship renders a plaintiff's allegations to the speculative level and, thus, insufficient. *See id.*

Moreover, the alleged interference must be directed at the third party with which the plaintiff alleges a prospective business relationship. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004). Tortious inference with a business relationship "is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Id.* Therefore, any conduct alleged to be tortious interference must be directed at the third party. *See id.* at 192 (citing *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) and *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). In opposition to this motion, Plaintiff argues that there are genuine questions of material

facts that are raised by its construction expert's affidavit (Dkt. No. 46-43). *See* Dkt. No. 46-48 at 29-30. Specifically, Plaintiff contends that Defendants' tortious actions delayed Plaintiff's plans to have occupancy available by June 2011. *See id.* There is nothing in the expert's affidavit that identifies third-parties with whom Plaintiff sought to have a business relationship. *See* Dkt. No. 46-43. Plaintiff has not come forward with, and the Court has not found, any evidence in the motion papers to support that Defendants directed any interference toward a third party. Accordingly, the Court grants summary judgment to Defendants and dismisses Plaintiff's sixth cause of action for tortious interference.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, the Court, for the above-stated reasons, hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 41) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter Judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 8, 2016
      Albany, New York

Mae A. D'Agostino
U.S. District Judge